UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DALLMAN ACQUISITION, LLC,

       Plaintiff,                          Case No. 2:10-cv-007
                                                    JUDGE GREGORY L. FROST
      v.                                        Magistrate Judge E.A. Preston Deavers

ERNEST R. DALLMAN, et al.,

       Defendants.

## OPINION AND ORDER

This matter is before the Court on Defendant Dunbar, Cook & Shepard, P.C.'s ("DC&S") Motion for Summary Judgment (ECF No. 22), Plaintiff's Memorandum in Opposition to Motion for Summary Judgment of Defendant DC&S (ECF No. 26), Defendant DC&S's Reply Memorandum in Support of Summary Judgment (ECF No. 27), and Defendant Earnest R. Dallman's ("Dallman") Response to Plaintiff's Memorandum in Opposition to Motion for Summary Judgment of Defendant DC&S (ECF No. 28). For the reasons that follow, the Court **GRANTS in part** and **DENIES in part** Defendant DC&S's Motion for Summary Judgment.

### I. Background

Dallman Acquisition, LLC ("Plaintiff") was formed by a group of investors for the purpose of negotiating the purchase of Dallman Industrial Corporation ("the Corporation") and investing in Dallman Industries, LLC ("the Industries"), the entity that would own the Corporation's assets. Bret Klisares is the manager of MIGG Capital LLC, the business entity that initiated the formation of Plaintiff. From September 2003 through June 2004, Klisares, on Plaintiff's behalf, participated in negotiations with Dallman for the sale of the Corporation.

Dallman had retained DC&S to audit the Corporation on an annual basis. On March 30, 2004, DC&S issued a draft audited financial statement ("AFS") to the Corporation that was based on the Corporation's inventory as of December 31, 2003. The draft AFS was given to Klisares in connection with the negotiations for the sale of the Corporation. Nicholas Dallas, a principal of DC&S, met with Klisares several times to discuss the draft AFS.

On June 8, 2004, the Industries entered into a contract titled "Asset Transfer Agreement" with Dallman and the Corporation for the purchase of the Corporation. Plaintiff contributed in excess of one million dollars in capital toward that purchase. In March 2005, the Industries went out of business.

Plaintiff filed suit against Dallman and DC&S alleging two categories of claims. The first category of claims are filed by Plaintiff in its capacity as the assignee of the contract rights belonging to the Industries. In that regard, Plaintiff alleges a breach of contract claim against Dallman. The second category involves claims filed by Plaintiff in its own name, alleging tort claims against DC&S and Dallman for fraud in the inducement and for negligent misrepresentation. Plaintiff claims that DC&S and Dallman overstated the Corporation's assets, inventory, and receivables.

Dallman filed counterclaims against the Industries for breach of contract. Dallman also filed counterclaims against Plaintiff for breach of fiduciary duties. Neither Plaintiff, in its own name or as assignee of the Industries, nor Dallman have moved for summary judgment on any of the claims filed against them and their time to do so has passed.

On November 23, 2010, DC&S filed its motion for summary judgment. That motion is now ripe for review.

## II. Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie Power Prods., Inc.*, 328 F.3d at 873 (quoting *Anderson*, 477 U.S. at 248). *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts" ). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law.' " *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234-35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

### III. Discussion

DC&S moves for summary judgment on both of the claims Plaintiff filed against it. The parties disagree as to whether Ohio or Indiana law applies to those two tort claims. Therefore, before the Court can determine the merits of those claims, it must first determine which state's law applies to them.

### A. Choice of Law

Plaintiff argues that Ohio law applies to the claims it filed against DC&S and Dallman and DC&S and Dallman argue that the law of Indiana applies. While the claims filed against Dallman are not the subject of the motion before the Court, Dallman filed a memorandum in "response" to Plaintiff's memorandum in opposition to DC&S's Motion for Summary Judgment. (ECF No. 28.) In that response, Dallman correctly indicates that the choice of law issue directly impacts the resolution of not only the tort claims filed against DC&S but also the tort claims filed against him. The Court accepts Dallman's brief pursuant to its inherent power to manage its docket. *See Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962) (trial court's possess inherent power to "manage their own affairs so as to achieve an orderly and expeditious disposition of cases").[1]

---

[1] The Court notes that the Local Rules of this Court do not provide a vehicle to file this type of brief without permission. *See* S. D. Ohio Civ. R. 7.2 (permitting only a motion with supporting memorandum, a memorandum in opposition, and a reply memorandum, except upon leave of Court for good cause shown). Because the choice of law issue directly impacts Dallman, it furthers the interest of justice to permit him to have a voice in this controversy, even though he failed to properly request permission to file his brief.

"A federal court sitting in diversity must apply the law of the forum state, including its choice of law principles." *Jamhour v. Scottsdale Ins. Co.*, 211 F.2d 941, 949 (6th Cir. 2002). Ohio has adopted the analysis set forth in the Second Restatement of the Conflict of Laws for determining which state's law applies to a tort claim. *See Morgan v. Biro Mfg. Co., Inc.*, 474 N.E.2d 286, 288-89 (Ohio 1984) ("We hereby adopt the theory stated in the Restatement of the Law of Conflicts [in analyzing a choice-of-law issue], as it is more reflective of our past decisions and also provides sufficient guidelines for future litigation."); *see also Am. Interstate Ins. Co. v. G & H Serv. Ctr.*, 861 N.E.2d 524, 527 (Ohio 2007) ("This court adopted the Restatement to govern choice-of-law analysis in *Morgan v. Biro Mfg. Co., Inc.*").

Plaintiff and DC&S both rely on the analysis of § 146 of the Second Restatement of the Conflict of Laws set forth in *Morgan* for the purpose of determining whether Ohio's choice of law rules dictate that Indiana or Ohio law controls here. As Dallman correctly notes, their reliance is misplaced. The *Morgan* court addressed a choice of law issue in the context of a personal injury claim. In doing so, the court examined § 146 of the Restatement, which specifically addresses personal injury actions.[2] Under that section, a presumption exists that the law of the place where the injury occurred controls. This presumption can be rebutted if another jurisdiction has a more significant relationship to the lawsuit, as determined by examining

---

[2]Section 146 provides: "In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied." Restatement (Second) of Conflict of Laws § 146 (1971).

factors set forth in § 145(2).[3]

Claims of fraud and misrepresentation, however, are not governed by § 146 of the Second Restatement of the Conflict of Laws, but rather by § 148. Section 148 applies to fraud and misrepresentation claims "where the harm suffered by the plaintiff is pecuniary in nature," which "is the sort of harm that is normally suffered through reliance on false representations." Restatement (Second) of Conflict of Laws § 148 cmt. c (1971); *see also Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818, 820-21 (6th Cir. 1990) (in Ohio "Section 148 of the Restatement (Second) of Conflict of Laws governs choice of law for claims of fraud"). The comments to the Restatement explain why the § 148 analysis focuses on the parties' contacts with a state relevant to the claims of fraud or misrepresentation as opposed to the place of injury focus of § 146. Comment c provides that where "the loss is pecuniary in its nature, the place of loss is far more difficult to locate than when the damage consists of physical injury to persons or to tangible things." Restatement (Second) of Conflict of Laws § 148 cmt. c (1971).

Section 148 provides in relevant part:

§ 148 Fraud and Misrepresentation
. . .
(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

(a) the place, or places, where the plaintiff acted in reliance upon the

---

[3]The factors set forth in § 145(2) include: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflict of Laws § 145 (1971).

6

>  defendant's representations,
>
>  (b) the place where the plaintiff received the representations,
>
>  (c) the place where the defendant made the representations,
>
>  (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
>
>  (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
>
>  (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148 (1971).

Here, the parties have more contacts relevant to the claims of fraud and misrepresentation with Indiana than with Ohio. The only significant contact with Ohio is the economic loss Plaintiff suffered allegedly as a result of its reliance upon DC&S's and Dallman's misrepresentations. That contact, however, is tempered somewhat by the fact that Plaintiff also acted in reliance in Indiana. That is, the Restatement recognizes that a plaintiff "may rely by entering into a contract either with the defendant or with a third person." Restatement (Second) of Conflict of Laws § 148 cmt. f (1971). Plaintiff here not only acted in reliance by expending finances in Ohio, Plaintiff also acted in reliance by authorizing the Industry to enter into a contract with Dallman and the Corporation in Indiana based upon the alleged misrepresentations of DC&S and Dallman. Thus, Plaintiff acted in reliance both in Ohio and in Indiana.

As to the place where Plaintiff received the representations and the place where DC&S and Dallman made the representations, this occurred almost exclusively in Indiana. Klisares, on behalf of Plaintiff, met with Dallman at least ten times prior to the Industries' purchase of the

7

Corporation and all but one of those meetings took place in Indiana. Additionally, all face-to-face meetings between Nick Dallas of DC&S and Klisares took place in Indiana. All of the work performed by DC&S in connection with the draft AFS occurred in Indiana and related to an Indiana corporation. The representations made by DC&S to Plaintiff occurred primarily in Indiana and were received by Plaintiff primarily in Indiana.

With regard to residency, the majority of the parties to this action are residents of and/or have a principal place of business in Indiana. Dallman resides in Indiana, DC&S is an Indiana corporation with its principal place of business in Indiana, the Industries is an Indiana limited liability corporation, and the Corporation is organized under the laws of Indiana with its principal place of business in Indiana. Plaintiff, an Ohio business, was formed solely for the purpose of obtaining an equity interest in the Indiana limited liability corporation so that it could purchase the Indiana corporation.

As for the final two contacts the Restatement directs the Court to consider, the Court finds it significant that Plaintiff reached into the state of Indiana to negotiate with an Indiana resident to purchase the assets of an Indiana corporation, by use of an Indiana limited liability company, in reliance on an Indiana accounting firms' and an Indiana resident's representations. The assets, books, and records of the Corporation were located in Indiana and Plaintiff made numerous contacts, including many in-person meetings, with Dallman and DC&S in Indiana before, during, and after the asset purchase was completed.

Finally, although it is not a contact enumerated in the Restatement, Plaintiff posits that one aspect of the parties' relationship was spelled out in a provision of the Asset Transfer Agreement. That contract, entered into between the Industries, the Corporation, and Dallman,

contains a provision that states "[t]his Agreement shall be governed by and construed in accordance with the domestic laws of the State of Ohio without giving effect to any choice or conflict of law provision or rule (whether of the State of Ohio or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Ohio."  (ECF No. 3-2 at 34.)  Plaintiff concedes, however, that the fraud and negligent misrepresentation claims are asserted solely in Plaintiff's individual capacity and not as assignee of the Industries. It is undisputed that neither Plaintiff nor DC&S were parties to the Asset Transfer Agreement. Therefore, the provision does not apply to Plaintiff's tort claims.  Additionally, as Dallman correctly notes, the language of the provision suggests it is limited solely to disputes arising under the agreement and not to independent tort claims.

      Based on the foregoing, the Court concludes that the substantive law of the state of Indiana is applicable to Plaintiff's fraud and misrepresentation claims.

## B.  DC&S's Motion for Summary Judgment

### 1.  Fraud

      Plaintiff alleges DC&S fraudulently induced it to authorize the Industries to enter into the Asset Transfer Agreement, by which the Industries purchased the Corporation.  DC&S requests summary judgment on Plaintiff's fraud claim, arguing that there is no evidence to support the elements of a claim of fraud and that Plaintiff has elected to pursue a contract claim against Dallman and is therefore prohibited from pursing a tort claim against DC&S.  This Court disagrees with both arguments.

#### a.  Election of remedies

      DC&S argues that Plaintiff cannot simultaneously claim it was fraudulently induced to

enter into a contract while seeking damages for breach of that same contract. DC&S is correct that in Indiana, "[g]enerally, a party bringing an action for fraud must elect between two remedies." *A. J.'s Auto. Sales v. Freet*, 725 N.E.2d 955, 969 (Ind. Ct. App. 2000) (citing *Hart v. Steel Prods., Inc.*, 666 N.E.2d 1270 (Ind. Ct. App. 1996)). "One alternative is to affirm the contract, retain the benefits, and seek damages. The other is to rescind the contract, return any benefits received, and be returned to the status quo." *Id.* DC&S relies upon this law to argue:

> Here Plaintiff has retained the benefit of the contract, and therefore, has elected to pursue contract damages. More importantly, Plaintiff had no contract with [DC&S]. Accordingly, Plaintiff has no contract remedy against [DC&S] and is entitled to judgment as a matter of law.

(ECF No. 22 at 6.)

As Plaintiff points out, the defect in this argument is readily apparent. There is no remedy election available to Plaintiff as it relates to DC&S. Plaintiff has not filed a breach of contract claim against DC&S nor could it do so since DC&S was not a signatory to the Asset Transfer Agreement. Instead, Plaintiff filed tort claims against DC&S claiming that, but for the misrepresentations of DC&S, the Industries would not have purchased the Corporation. This claim is not precluded simply because Plaintiff has also pursued a breach of contract claim against other entities related to the same asset purchase. DC&S gets no exemption from this type of claim by virtue of the fact that another entity is subject to a breach of contract claim related to the same underlying facts.

Consequently, DC&S is not entitled to judgment as a matter of law based upon an election of remedies theory.

### b. Plaintiff's claim of fraudulent inducement

DC&S argues that it is entitled to summary judgment on Plaintiff's fraudulent

inducement claim because expression of opinions do not constitute fraud, because Plaintiff should have verified the inventory itself, and because DC&S made no knowing misrepresentation of fact.  DC&S's arguments are not well taken.

### i. Expressions of opinion

DC&S perfunctorily argues that an expression of opinion cannot constitute fraud.  (ECF No. 22 at 7 (its argument in its entirety: "As a general rule, expression of opinions do not constitute fraud.").  Apparently, DC&S contends that the draft AFS was an expression of opinion.  This argument, however, lacks merit.

Under Indiana law it is true that expressions of opinion cannot constitute fraud.  *See Pugh's IGA, Inc. v. Super Food Services, Inc.*, 531 N.E.2d 1194 , 1198 (Ind. Ct. App. 1988) (citing *Jenkins v. Long*, 19 Ind. 28, 29 (1862)).  As the seminal Indiana Supreme Court case explains:

> If the representation was that the profits of the business had been, and then were, fifteen hundred dollars a year, and the representation was relied on in making the purchase, and it was false, it may have been such an one as amounted to fraud; because it was a representation of a fact, and not the expression of an opinion; whereas, had the representations been that the profits would amount, in future, to fifteen hundred dollars, it would not have been a fraud, because it would have been the expression of an opinion, and not the representation of an asserted existing fact.

*Jenkins*, 19 Ind. at 29.

Based on this law, the Court finds that the draft AFS in no way constitutes an opinion, but instead represents facts, *i.e.*, what the assets and liabilities, cash flows, profits and losses of the Corporation were for the year 2003.  The draft AFS did not opine on what future assets and liabilities, cash flows, or profits and losses may be for the Corporation.  *Pugh's IGA*, 531 N.E.2d at 1198 ("Super Foods' projections were mere statements of opinion as to future profits rather

than past or existing facts.").

Accordingly, DC&S is not entitled to summary judgment based upon its argument that the draft AFS is the expression of opinion.

### ii. Opportunity to examine the Corporation

DC&S argues that because the representations it made in the draft AFS regarded the "value, quality, or condition of real property," Plaintiff had "no right to rely upon the representations of [DC&S] if there [wa]s reasonable opportunity to examine the property and to judge it's a value and qualities for [it]self." (ECF No. 22 at 7.) As support for this proposition DC&S cites to *Shepard v. Goben*, 142 Ind. 318 (Ind. 1895). That case held that the purchaser of real property, a farm, had no right to rely on the grantor's statements as to the quality of the property if he had a reasonable opportunity to examine the property and judge its quality for himself.

Here, DC&S has offered no evidence that upon inspection Plaintiff could have determined the deceit in the alleged false representation. *See id.* ("the vendor could not defeat a recovery by showing an inspection of the land, if it appeared that an inspection would not disclose the deceit in the alleged false representations"). It seems unlikely that Plaintiff, even if a sophisticated buyer, could determine the value of the Corporation's assets, liabilities, cash flows, or profits and losses upon its own inspection. If it could, the need for a professional accounting firm would be unnecessary. Indeed, the Indiana courts accept that a party's reliance is justifiable if that party sought out specific financial data and that data contained false information. *See Wisconics Engineering, Inc. v. Fisher*, 466 N.E.2d 745, 757-58 (Ind. Ct. App. 1984) ("Ordinary prudence and diligence would demand, in the least, that they seek specific

financial and business data to verify the representations of profitability. Were they able to show specific financial data or specific government contracts containing false information which had been asserted as true, reliance might have been justified giving rise to actionable fraud.")

Consequently, the Court finds that Plaintiff's failure to verify the information found in the draft AFS does not entitle DC&S to judgment as a matter of law.

### iii. Misrepresentation

"Fraudulent inducement occurs when a party is induced through fraudulent misrepresentations to enter into a contract." *Lightning Litho, Inc. v. Danka Indus.*, 776 N.E.2d 1238, 1241 (Ind. Ct. App. 2002) (citing *Circle Ctr. Dev. Co. v. Y/G Ind., L.P.*, 762 N.E.2d 176, 179 (Ind. Ct. App. 2002)). It is unclear whether Plaintiff is alleging actual or constructive fraud. Under either, however, the Court concludes that DC&S is not entitled to summary judgment.

To establish actual fraud, Plaintiff must show: (1) a material representation of a past or existing fact which; (2) was false; (3) was made with knowledge or reckless ignorance of its falsity; (4) was made with the intent to deceive; (5) was reasonably relied upon by the complaining party, and; (6) proximately caused injury to the complaining party. *Bilimoria Computer Sys., LLC v. Am. Online, Inc.*, 829 N.E.2d 150, 155 (Ind. Ct. App. 2005). Similarly, constructive fraud requires: (1) a duty owed by the party to be charged to the complaining party due to their relationship, (2) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists, (3) reasonable reliance thereon by the complaining party, (4) injury to the complaining party as a proximate result thereof, and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party. *Wheatcraft v. Wheatcraft*, 825 N.E.2d 23, 30 (Ind. Ct. App.

2005). Unlike actual fraud, intent to deceive is not an element of constructive fraud. Rather, the law infers fraud from the relationship of the parties and the circumstances which surround them. *Pugh's IGA*, 531 N.E.2d at 1197.

DC&S argues that Plaintiff cannot maintain a claim of actual or constructive fraud because DC&S made "no 'knowing misstatement' or 'misrepresentation' of any existing fact" on the draft AFS. (ECF No. 22 at 7.) DC&S contends that none of the statements made to Plaintiff by DC&S representative Dallas were "known by [him] to be false." (Dallas Sum. J. Aff. ¶ 7.) It is apparently undisputed that the draft AFS did not accurately reflect the financial condition of the Corporation at the time Plaintiff entered into the Asset Transfer Agreement. Dallas, however, avers that the draft AFS did not reflect false information but rather reflected incomplete conclusions because DC&S needed "additional information" that it had not received. (*Id.* ¶¶ 4, 5.) Plaintiff, however, offers evidence showing that DC&S assured it that the draft AFS was a complete and accurate reflection of the financial condition of the Corporation at the time Plaintiff was considering purchasing the Corporation and that Plaintiff relied upon this assurance to authorize the Industries to purchase the Corporation. That is, that there was no additional information needed for the draft AFS to accurately reflect the Corporation's financial condition.

Plaintiff further submits evidence from which a jury could reasonably and justifiably infer that the draft AFS was offered as an accurate final reflection of the financial condition of the Corporation. Specifically, the Asset Transfer Agreement itself included representations that the draft AFS had been prepared in accordance with generally accepted accounting principles ("GAAP"), presented fairly the financial condition of the Corporation in all material respects,

was complete and correct in all material respects, and was consistent with the books and records of the Corporation. (Dallas Dep., Ex. 20 at 10, May 12, 2010, ECF No. 29.) The draft AFS was also included as an exhibit to the Asset Transfer Agreement.

As for the draft AFS itself, it was signed by DC&S and included the firm's statement that it had audited the Corporation and had reached an opinion:

> We have audited the accompanying balance sheet of Dallman Industrial Corporation (an Indiana Corporation) as of December 31, 2003, and the related statements of operations and comprehensive loss, changes in equity, and cash flows for the year then ended. . . .
> . . .
>
> In our opinion, the financial statements referred to in the first paragraph present fairly, in all material respects, the financial position of Dallman Industrial Corporation as of December 31, 2003, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

(Dallas Dep., Ex. 21, May 12, 2010, ECF No. 29.)

Additionally, the draft AFS was the subject of oral conversations between Klisares, on behalf of Plaintiff, and Dallas, on behalf of DC&S. Klisares testified that Dallas stated "that all of his field work was done and he felt comfortable that all the numbers were right and in accordance with GAAP." (Klisares Dep. 230:9-12, May 20, 2010, ECF No. 25.) Klisares further testified that "[Plaintiff] got comfort from conversations with Nick Dallas that the numbers were final, they had finished their field work, everything was done and those were the final numbers." (Klisares Dep. 59:6-9, May 20, 2010, ECF No. 25.)

Throughout his deposition testimony, Klisares explained that he informed Dallas in no uncertain terms that Plaintiff was relying on Dallas's statements about the financial condition of the Corporation to determine how Plaintiff would value the Corporation and, more importantly,

15

on whether the Plaintiff would purchase the Corporation:

> Q. And you've mentioned this a number of times today and I just want to follow up on it that you told Nick Dallas how important the numbers were on that 12/31/03 financial statement, because the purchase price was based on those – on those numbers. Is that an accurate restatement of your testimony?
>
> A. Not just – the purchase price was – basically doing the deal was based on that.

(Klisares Dep. 263:3-11, May 20, 2010, ECF No. 25.)

Based on the foregoing testimony about Dallas's statements to Klisares and the statements made in the draft AFS, a reasonable jury could find that Dallas made knowing misrepresentations to Klisares upon which Plaintiff relied to its detriment. That is, Dallas's testimony indicates that he lacked all of the facts necessary to make a representation that the draft AFS fairly presented the financial position of the Corporation. Yet, if Klisares is to be believed, that is exactly what Dallas represented to him. And, regardless of the fact that the draft AFS indicated that it was a "draft," nowhere in the document did it indicate that the conclusions reached could be altered upon further investigation. Indeed, just the opposite. (*See* Dallas Dep., Ex. 21, May 12, 2010, ECF No. 29) ("in all material respects" the draft AFS reflects "the financial position of Dallman Industrial Corporation as of December 31, 2003"). Therefore, the Court concludes that, accepting Plaintiff's evidence as true and drawing all justifiable inferences in its favor, there are genuine issues of material fact as to whether Plaintiff was fraudulently induced to authorize the Industries to enter into a contract to purchase the Corporation. Thus, the Court **DENIES** DC&S's Motion for Summary Judgment as it relates to Plaintiff's fraudulent inducement claim.

### 2. Negligent Misrepresentation

Defendant DC&S argues that it is entitled to summary judgment on Plaintiff's negligent

misrepresentation claim because there is no evidence that DC&S was negligent, because Indiana does not recognize this tort absent privity and no privity exits here, and because it is barred by the statute of limitations. The Court finds it necessary to only address DC&S's statute of limitations argument.

DC&S argues that Plaintiff's negligent misrepresentation claim is barred by the statute of limitations found in Indiana's Accountancy Act and/or Indiana's general malpractice statute. If either of these statutes applies, Plaintiff does not dispute that its claim would be barred.

The Indiana Accountancy Act applies to all actions

> based on negligence or breach of contract brought against an accountant, a partnership of accountants, or an accounting corporation registered, licensed, or practicing in Indiana by an individual or a business entity claiming to have been injured as a result of financial statements or other information examined, compiled, certified, audited, or reported on by the defendant accountant as a result of an agreement to provide professional accounting services.

Ind. Code § 25-2.1-15-1.

Plaintiff argues that, by its terms, the Accountancy Act does not apply to its negligent misrepresentation claim because it specifically requires a claim to be filed against an "accountant as a result of an agreement to provide professional accounting services." *Id.* Here, there was no agreement between DC&S and Plaintiff for professional accounting services. Instead, the agreement for professional accounting services was between DC&S and Dallman. DC&S does not respond to this argument.

As to what the parties refer to as the general malpractice statute,[4] it provides:

---

[4]DC&S cites to the Indiana Code § 34-1-2-2(1), referring to it as the "general malpractice statute." (ECF No. 22 at 14.) That statute, however, has been repealed and is currently found at § 34-11-2-4 of the Code.

>Injury to person or character -- Injury to personal property -- Forfeiture of penalty given by statute.
>
>An action for:
>
>(1) injury to person or character,
>
>(2) injury to personal property; or
>
>(3) a forfeiture of penalty given by statute;
>must be commenced within two (2) years after the cause of action accrues.

Ind. Code § 34-11-2-4.

As support for its argument that this statute applies here, DC&S cites the Court to *Davis v. Geo. S. Olive & Co.*, 731 F. Supp. 1380 (S.D. Ind. 1990). In that case, the court explained that in Indiana "it is the nature or substance of the cause of action, rather than the form of the action, which determines the applicability of the statute of limitations." *Id.* at 1382 (citing *Shideler v. Dwyer*, 417 N.E.2d 281, 285 (Ind. 1981)). The court further explained that, regardless of a plaintiff's characterization of a claim, "the applicable statute of limitations should be ascertained by reference to the nature of the *harm* alleged." *Id*. at 1384 (quoting *Whitehouse v. Quinn*, 477 N.E.2d 270, 273 (Ind. 1985) (emphasis added by *Davis* court). The Court finds *Davis* instructive.

The plaintiff in *Davis* alleged accounting malpractice based upon an accountant allegedly providing faulty tax information that resulted in the plaintiff paying "more taxes to the government for the taxable year 1984 than he was legally obligated to pay." *Id.* The court determined that the harm the plaintiff suffered was the loss of the "use of money that he once possessed." *Id.* The court then explained that, under Indiana precedent, the plaintiff's "loss of money can best be characterized as injury to personal property." *Id.* Consequently, the court

concluded that "the substance of [the plaintiff's claim] against [the defendant accountant] is for injury to personal property resulting from accountant malpractice." *Id.* The court then held that the two year limit found in § 34-1-2-2(1) of the Indiana Code applied.

In the instant action, Plaintiff's loss is the same as the *Davis* plaintiff's loss, *i.e.*, the loss of money. Thus, an Indiana court would characterize this loss as injury to personal property resulting from alleged negligent misrepresentation and apply the two year limitation period contained in § 34-1-2-2(1) of the Indiana Code. Accordingly, Plaintiff's negligent misrepresentation claim is barred and the Court **GRANTS** DC&S's Motion for Summary Judgment on that claim.

### IV. Conclusion

Based on the foregoing, the Court **GRANTS in part and DENIES in part** Defendant DC&S's Motion for Summary Judgment. (ECF No. 22.) Specifically, the Court **GRANTS** the motion as it relates to Plaintiff's negligent misrepresentation claim and **DENIES** the motion as it relates to Plaintiff's fraud claim.

**IT IS SO ORDERED**.

                                                   s/ Gregory L. Frost
                                                   GREGORY L. FROST
                                                   UNITED STATES DISTRICT JUDGE